[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11255

_____

BRYAN TURNER,

Plaintiff-Appellant,

*versus*

MIKE WILLIAMS,
as Sheriff of the City of Jacksonville and of Duval County,
MIKE WILLIAMS,
individually,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

D.C. Docket No. 3:19-cv-00641-TJC-JRK

———————————————

Before LAGOA, BRASHER, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

Bryan Turner appeals the dismissal of his complaint under Federal Rule of Civil Procedure 12(b)(6). Below, Turner alleged Mike Williams, in his individual capacity and official capacity as sheriff, violated his First Amendment rights and falsely arrested him. Because probable cause existed to arrest Turner and his Second Amended Complaint (the "Complaint") has not sufficiently alleged that Williams otherwise retaliated against him for protected speech, we affirm.

## I.

### A.

We recite the facts as stated in Turner's Second Amended Complaint, excluding the pleadings not entitled to the assumption of truth due to their conclusory nature. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009).

"In or about 2008," Turner retired from the Nassau County Sheriff's Office (the "NCSO") after fourteen years as a deputy, having obtained the rank of sergeant. Immediately upon retiring, Turner accepted a similar position with the Jacksonville Sheriff's Office (the "JSO"). Though it is customary for retiring deputies to be given a retired deputy identification card, Turner did not receive

one from the NCSO due to a clerical error—an error he did not attempt to redress because he was starting work as a deputy at the JSO.

Bill Leeper was elected as the Nassau County Sheriff in 2012 and won reelection in 2016. While running for reelection in 2016, Leeper announced he would not seek a third term as sheriff in 2020. Having learned of the potential vacancy, Turner began communicating to those at the NCSO and JSO, including Jacksonville Sheriff Mike Williams, his intention to run for Nassau County Sheriff in 2020 against a candidate named Roy Henderson.

In the latter half of January 2017, Turner attended a political event as Williams's guest. At the event, Williams and Turner discussed Turner's potential 2020 candidacy in Nassau County. Williams stated that Turner had "enough backing that [he] may win" and prodded "repeatedly for a reason why [Turner] was running against Henderson."

## B.

By early 2017, Turner had been employed by the JSO for around nine years. Between his work at the two sheriff's offices, he had a combined ten years of experience working in narcotics squads. In early February 2017, Turner was assigned to work undercover as part of his narcotics squad work. The "standard procedure was to pose as drug buyers and proceed to buy drugs on the street" in "less affluent neighborhoods where the drug trade is more prevalent." "[A]lmost without exception[,] the undercover

officers kept beer and cigarettes in their vehicles, items in the nature of 'props,'" when "interacting with buyers, sellers, and informants."

On February 6, 2017, Turner was assigned to work overtime as part of an undercover team to provide protection and training for Kyle Kvies, a former patrol officer who was a rookie in undercover work. Turner, Kvies, and a third officer, Lance Griffis, rode in an unmarked police Jeep Cherokee with Turner in the passenger seat and Kvies in the back seat. Because the objective was to train Kvies in undercover work, the team planned to "mak[e] contact with someone from whom the team had previously bought drugs" and buy a small amount of cocaine from him.

The team made contact with a potential seller. The seller sat in the backseat and directed the team to where he could get cocaine for them. The team brought the seller to an indicated location. The seller exited the car, rounded a corner, then returned saying that he could not close a deal here. The team then drove the seller to a second location, ostensibly to try again. At the second location, the seller got out of the Jeep Cherokee, leaving behind a small bag of cocaine on the floor of the backseat of the car.[1] The seller started walking away, turned around, and told Kvies

---

[1] The seller apparently either had the cocaine when the team first made contact with him or had, in fact, successfully purchased cocaine at the first location.

through the window, "looks like you dropped something," thus effectuating a purchase.

As soon as the seller departed, an armed assailant approached the vehicle, and, from a few feet away, pointed a handgun at Turner's head. Turner glanced over the assailant's shoulder as a feint. While the assailant quickly looked to see what was behind him, Turner unholstered his service weapon and fired multiple times, killing the assailant. Due to the trauma of this officer-involved shooting ("OIS"), Turner has an imperfect recollection of the events that immediately followed the OIS.

Immediately after the OIS, all three of the undercover officers exited the vehicle to scan the area for other potential shooters. And within twenty seconds of the OIS, Kvies began a recording on his iPhone that documented him saying, "Hey, get all the beer," and Turner agreeing. Kvies then rounded up two unopened cans and one opened bottle of beer that were in the Jeep Cherokee and tossed them in a nearby yard.

Sometime after the disposal, a crowd of personnel from the JSO arrived at the scene in response to the OIS. This group included Turner's lieutenant, Turner's sergeant, and a lawyer from the Fraternal Order of Police named William Vogalsang. Vogalsang was there to protect Turner's interests. The lieutenant and sergeant asked Turner, "have y'all been drinking"? Turner responded, "no, but there is beer in the car." When the lieutenant and sergeant asked Kvies and Griffis about drinking, they did not say that the car contained beer, nor that they had thrown away any

beer props. Despite the car being within reach, it was not until the next morning, when Kvies admitted to throwing away the beer, that those in authority became aware that Turner incorrectly stated there was beer in the car. After being questioned at the scene of the OIS, Turner was brought into a police vehicle with the assistant chief, who noted the lack of alcohol smell on Turner and placed him on paid administrative leave pending an investigation of the OIS.

## C.

Around February 8, the Jeep Cherokee was issued to other officers, who discovered the bag of cocaine from February 6 still on the floor of the backseat.

Turner returned from administrative leave on February 16, 2017. He arrived at the Fraternal Order of Police office between 10:00 and 10:30 a.m. to meet with Vogalsang and give his statement about the OIS. At this meeting, Vogalsang told Turner that "JAX SHERIFF's administration," including Sheriff Williams, had discussed the potential of arresting the whole undercover team from February 6 for tampering with evidence.

At around 11:00 a.m. that same day, the JSO Integrity Division interviewed Turner—with Vogalsang present. During the interview, "Vogalsang walked outside of the interview room with the integrity sergeant, and was informed that warrants had already been obtained for [Turner's], Kvies'[s] and Griffis's arrests," charging them with tampering with evidence and conspiracy to tamper

with evidence under Fla. Stat. §§ 918.13 and 717.04(3).[2] A detective with the JSO Integrity/Special Investigations Unit had procured the arrest warrants after obtaining the approval of an "[a]ssistant [s]tate [a]ttorney" and the signature of a Duval County court judge.[3]

A JSO officer served Turner with the warrant that same day, and Turner was "admitted to the jail" at 12:20 p.m. He was then placed on administrative leave without pay and released on his own recognizance. Kvies and Griffis were also arrested.

Roughly a week after the arrest, Ray Bullard, "a retired fire-fighter who at that time held a part-time position with" the NCSO, visited Turner at home. Bullard told Turner that Williams and Henderson were close because Henderson had previously worked as Williams's supervisor at the JSO. He also intimated that he had heard Henderson say that Henderson could not beat Turner in the

---

[2] The Complaint alleges that sometime before the arrest warrants issued—and possibly before the events of February 6—the JSO leadership and Vogalsang met to decide to arrest Turner. It is unclear from the Complaint when this meeting allegedly took place. Although it does state the meeting occurred before there was probable cause to arrest Turner, the Complaint also asserts there was never probable cause to arrest him. Therefore, that additional detail does little to timestamp the alleged meeting.

[3] We take judicial notice that the assistant state attorney was a member of the office of the State Attorney of the Fourth Circuit of Florida. The Fourth Circuit consists of Duval, Nassau, and Clay counties. According to the warrant affidavit for the arrests of Turner, Kvies, and Griffis attached to the Complaint, the judge who signed it was a judge of the County Court of Duval County.

election, but that Williams would "take care of that." Finally, Bullard relayed that he had heard Henderson say that Williams and Leeper were working together to scuttle Turner's 2020 sheriff candidacy.

On August 31, 2017, an assistant state attorney announced that he was declining to prosecute Turner.[4] Turner, however, was told that upon returning from leave, he would be permanently assigned to teleserve (work a desk job) at the JSO. In response, Turner resigned from the JSO and surrendered his state-issued law enforcement certificate. The charges were dropped against the other two undercover officers from February 6 in exchange for their completion of community service hours.[5]

---

[4] Turner's Complaint alleges that Turner was prosecuted, but Kvies and Griffis were not. This is not true. According to the disposition notice attached to the Complaint, Turner was not prosecuted. Rather, an assistant state attorney declined to prosecute Turner six days before his scheduled arraignment. Further, as discussed *infra* note 5, given that Kvies and Griffis were compelled to complete community service, they may actually have gone further down the path of prosecution than Turner did, even taking the facts as stated in the Complaint.

[5] Turner's Complaint does not indicate who supervised Kvies's and Griffis's community service. It is possible that someone at the JSO arranged community service as a condition of withholding prosecution. But considering Kvies and Griffis were both arrested, it is much more likely the community service was either judicially supervised or arranged by the state attorney's office. This strikes us as more serious than Turner not being prosecuted at all.

21-11255               Opinion of the Court                    9

At some point after his arrest, Turner attempted to remedy the clerical error with the NCSO from nine years earlier and obtain a retired deputy identification card.  Sheriff Leeper refused this request.  On February 15, 2018, Turner requested the NCSO that he complete a retirement shooting requalification so he could continue carrying a firearm.  This request was also denied by an employee of the NCSO.

### D.

Turner filed his original complaint in the Circuit Court for Duval County, Florida.  After Williams removed the case to the District Court for the Middle District of Florida,[6] Turner amended his complaint twice.

Turner's original complaint asserted eight counts against Williams and Leeper in their individual and official capacities and contained 134 paragraphs of allegations.[7]  Williams, on June 13, 2019, and Leeper, on June 7, filed motions to dismiss this complaint

---

[6] A defendant can remove a civil action from state court to a federal district court where the federal court has original jurisdiction.  28 U.S.C. § 1441.  Federal district courts have original jurisdiction to entertain civil actions arising under laws of the United States such as 42 U.S.C. § 1983.  28 U.S.C. § 1331.  Where a district court has original jurisdiction over a federal question, it "shall have supplemental jurisdiction over all other claims . . . [that] form part of the same case or controversy."  Id. § 1367(a).

[7] Each count in the original complaint adopted all of the allegations prior to the first count, and every allegation within each count consisted of a legal conclusion.

under Rule 12(b)(6) of the Federal Rules of Civil Procedure, assert-ing that the allegations of the complaint failed to satisfy the require-ments of *Twombly* and *Iqbal*,[8] being replete with conclusory alle-gations, and failed to give the defendants fair notice of the claims and grounds upon which the claims rest as required by Rule 8(a).[9]

Turner filed an amended Complaint on June 14 as a matter of right. *See* Fed. R. Civ. P. 15(a)(1)(B). This version of the com-plaint continued to assert eight counts against Williams and Leeper in their individual and official capacities and contained 143 para-graphs of allegations.[10] Williams and Leeper filed motions to dis-miss this amended complaint under Rule 12(b)(6) as well, again as-serting that the allegations of the complaint failed to satisfy the

---

[8] Under the *Twombly* and *Iqbal* standard, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009). After removing legal conclusions from a pleading, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions[] and a formulaic recitation of the elements of a cause of action" to form "[f]actual allegations [that] raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964–65 (2007) (first alteration in original).

[9] Federal Rule of Civil Procedure 8(a) provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim show-ing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

[10] Again, each count in the first amended complaint adopted all of the allega-tions prior to the first count, and, again, every allegation within each count consisted of a legal conclusion.

requirements of *Twombly* and *Iqbal*, being replete with conclusory allegations, and failed to give the defendants fair notice of the claims and grounds upon which the claims rest as required by Rule 8(a).

The District Court issued an order on the motions, finding that Turner's Complaint constituted a shotgun pleading due to its lack of clarity and, in the alternative, that it did not state a claim for relief.[11]   But the Court granted Turner leave to file a second amended complaint if he had a good faith basis for doing so. Turner availed himself of this opportunity and filed a Second Amended Complaint (the operative "Complaint" on appeal).  This Complaint asserts six counts against Williams and Leeper in their individual and official capacities and contains 185 paragraphs of allegations.[12]  Each asserted count arises out of essentially the same set of facts.

---

[11] A dismissal on shotgun pleading grounds "is appropriate where 'it is *virtually impossible* to know which allegations of fact are intended to support which claim(s) for relief.'"  *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1325 (11th Cir. 2015) (emphasis in original) (quoting *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)); *see also T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1543 n.14 (11th Cir. 1985) (Tjoflat, J., dissenting).  That is not quite the case here.

[12] Each count in the Second Amended Complaint still substantially adopts all of the allegations prior to the first count, with minor exceptions.  While the Complaint does not quite adopt allegations in bulk, every allegation within each count still consists of a legal conclusion.

- Count One is a 42 U.S.C. § 1983 First Amendment claim alleging retaliation for engaging in speech against Williams in his official capacity as Jacksonville Sheriff.

- Count Two is a § 1983 First Amendment claim alleging retaliation for engaging in speech against Williams in his individual capacity.

- Count Three is a § 1983 First Amendment claim alleging retaliation for engaging in speech against Leeper in his official capacity as Nassau County Sheriff.[13]

- Count Four is a civil conspiracy claim under Florida common law against Williams and Leeper in their individual capacities for allegedly violating Turner's First Amendment rights.[14]

- Count Five is a false imprisonment/arrest claim under Florida common law against Williams in his official capacity.

- Count Six is a false imprisonment/arrest claim under Florida common law against Williams in his individual capacity.

Williams and Leeper again filed motions to dismiss under Rule 12(b)(6), still asserting that the allegations of the Complaint

---

[13] This count is no longer live since Leeper is no longer a party.

[14] Turner's Complaint mentions a conspiracy action under 42 U.S.C. § 1985 but makes no allegations in reference to such a claim. Turner also does not raise a § 1985 claim in his briefs on appeal, so we do not address it here.

fail to satisfy the requirements of *Twombly* and *Iqbal*, again being replete with conclusory allegations, and fail to give the defendants fair notice of the claims and grounds upon which the claims rest as required by Rule 8(a). Before obtaining a ruling on the motions to dismiss, Turner and Leeper filed a joint stipulation, which the Court accepted, dismissing the action against Leeper with prejudice, thus leaving only Williams in his individual and official capacities as appellees here.

The District Court dismissed Turner's Second Amended Complaint with prejudice, finding the Complaint still fails to state a claim under the *Twobly* and *Iqbal* standard and does not cure the deficiencies that made the first amended complaint a shotgun pleading. Turner appeals this order.

## II.

We review *de novo* a district court's dismissal of a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019). "We accept the *factual* allegations in the [C]omplaint as true and construe them in the light most favorable" to Turner. *Id.* (emphasis added) (citing *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th Cir. 2008)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). The alleged facts, having been stripped of all legal conclusions, must make a claim for relief not merely *possible*, but *plausible*. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.

Ct. 1955, 1974 (2007). We require "more than labels and conclusions," *id.* at 555, 127 S. Ct. at 1965, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a Rule 12(b)(6) motion. *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. Further, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (internal quotations omitted) (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966).

As noted *supra*, the Complaint is replete with "conclusory statements" of fact and "legal conclusions."[15] To review the

---

[15] As an example, Count Four, like the other five counts, contains exclusively legal conclusions except for the paragraph reincorporating the allegations preceding Count One:

> 164. This count sets forth claim against the Individual Defendants for civil conspiracy under the common law of Florida.

> 165. The Individual Defendants acted as conspirators to take actions against Plaintiff as set forth above. Thus, the underlying actionable torts or other actions, which constituted the purposes of the conspiracy, include but are not limited to false arrest.

> 166. Alternatively, the Individual Defendants are liable for the tort of civil conspiracy, standing alone, based upon the exceptional circumstances surrounding the facts of this case which have led to the instant action.

> 167. The term of the conspiracy commenced prior to Plaintiff's wrongful arrest, and has been ongoing.

21-11255                Opinion of the Court                15

sufficiency of the Complaint, we would have to strip it of these allegations and focus on the facts alleged and the legal theories they allegedly support.  This problem clearly existed in the District Court.

Where a district court faces an amended complaint containing multiple claims for relief based on conclusory and ambiguous allegations, the court has two options.  After disregarding legal conclusions and conclusory statements of fact, it can dismiss the amended complaint with an explanation of why it is deficient and grant the plaintiff leave to amend, or it can convene a conference of counsel, explain why the amended complaint is deficient, determine whether the pleader can cure the amended complaint's deficiencies, and, if he can, have the pleader replead the amended complaint accordingly and without delay.[16]

_____

> 168.    The conspiracy among the Individual Defendants was a conspiracy to do one or more unlawful acts by unlawful means.
>
> 169.    Each of the Individual Defendants engaged in overt acts in furtherance of the conspiracy, as described above.
>
> 170.    The damages to Plaintiff were in violation of his constitutional protections under the First Amendment of the United States Constitution.  Plaintiff has been damaged as set forth above.

Second Am. Compl. 28.

[16] *See* Fed. R. Civ. P. 16(c)(2)(A)–(B) ("At any pretrial conference, the court may consider and take appropriate action on the following matters: (A)

On appeal, when this Court faces a pleading that, without additional work, is practically unreviewable, we also have two options. We can remand the case to the district court for further proceedings, or, based solely on the allegations of the pleadings, we can reframe the pleading ourselves, using the non-conclusory factual allegations and applying the law to the well-pled facts to determine if the pleader has stated a claim for relief. Here, we opt for the latter.[17]

In addition to the abundance of legal conclusions, the facts in the Complaint cover a span of nine years (2008, when Turner retired from the NCSO, to 2017) and the behavior of a plethora of individuals in two sheriff's departments. The Complaint's allegations also jump around in time rather than portray an organized, linear picture of events. Most importantly, the Complaint's allegations within each count do not clearly identify which specific

---

formulating and simplifying the issues, and eliminating frivolous claims or defenses; (B) amending the pleadings if necessary or desirable.")

[17] We do so instead of remanding the case to the District Court because Turner has had three opportunities to plead his case, with warnings first in the defendants' motions to dismiss the original and amended complaints and then in the District Court's admonitions in dismissing the amended complaint. We are not confident that a third amended complaint would cure the pleading deficiencies—especially under the *Twombly* and *Iqbal* standards requiring pleadings to allege facts that are more than "merely consistent" with liability. *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966). We also opt to reframe for purposes of efficiency since the Complaint here contains a glimmer of a plausible claim—as the forthcoming analysis shows.

factual allegations the count incorporates by reference align with the asserted claim.  Much like a puzzle, for each count, the Complaint dumps pieces on the ground in the form of nine years of facts.  Then it props up a picture of the completed puzzle in the form of asserted causes of action and "recitals of the elements."  *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949.  But it leaves the defendants and District Court the task of putting the puzzle together by guessing what "actions [Williams took] in violation of [Turner's] rights under the First Amendment," how "[t]hese violations were of the type and character as to which any reasonable person or institution would be aware," and so on.  Second Am. Compl. 21.

For instance, we know the Complaint alleges that Turner's arrest constituted retaliatory conduct.  But it also alleges that "[t]he retaliatory actions against [Turner] have continued and remain ongoing," after which it provides an example that we address later.  This ambiguity would make it difficult for a defendant to intelligently respond.  The Complaint also alleges that Williams's "disciplining and/or terminating" constituted retaliatory action.  We assume this refers to the assignment to teleserve, but that is not explicit.  For one, Turner was not terminated.  The Complaint alleges that after he was informed of his future career trajectory, he submitted "written notice of his retirement."[18]  While we may miss

---

[18] Further, beyond the passing reference to the "discipling and/or terminating" of Turner, the Complaint does not allege facts suggesting a claim of constructive termination.

some details of what the Complaint intended to communicate due to its ambiguous and conclusory allegations, we can salvage something, even on appeal.[19] We can boil the case down by pruning the legal conclusions and applying the well-pled facts to the legal principles clearly espoused in the Complaint's respective counts.

In essence, all of Turner's claims relate to one overarching incident. According to the Complaint, Williams retaliated against him in two ways for announcing his intention to run for Nassau County Sheriff. One was by having Turner arrested,[20] and the other was condemning him to a lifetime of teleserve.[21] The First Amendment protects Turner's announcement to run for sheriff. Nobody stopped him from speaking, but the Complaint alleges that Williams, individually and acting under the color of law, orchestrated and conspired to orchestrate retaliatory actions in the form of the arrest and reassignment to teleserve for Turner's speech.

---

[19] This is more than can be said about the average shotgun pleading.

[20] All counts of the Complaint implicate this alleged harm. The First Amendment retaliation claims clearly regard the arrest. The false imprisonment/arrest claims, by definition, must regard the arrest. And the conspiracy claim is about an agreement to effectuate the arrest and the arrest itself.

[21] Counts One through Four involve this alleged harm. The Complaint alleges that the reassignment to teleserve was retaliation for Turner announcing his sheriff run, thus including the First Amendment retaliation claims. And we can assume that the conspiracy count includes agreement to retaliate in this regard as well.

Therefore, we can regroup the counts into issues to simplify the analysis. The arrest is issue one. We will analyze the First Amendment retaliation claim against Williams individually as to the arrest. If we find no retaliation, and thus that Turner was validly arrested, the false imprisonment/arrest claims cannot survive and there can be no concomitant conspiracy. The claims against Williams in his official capacity would also not survive since those claims require satisfaction of the individual claim, plus a route to municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018 (1978). The reassignment to teleserve, then, is issue two. For the same reasons as the arrest, if we find no individual liability under the retaliation claim, the official capacity claim and the conspiracy claim cannot survive.

At bottom, we affirm the District Court not because Turner's Complaint is a shotgun pleading, but rather because, even after we salvage the pleading and reframe it in our more straightforward fashion, the Complaint fails to state a claim. There was probable cause to arrest Turner, and the Complaint does not allege that, within the JSO, reassignment to teleserve for tampering with evidence was an aberration. In fact, the Complaint suggests teleserve reassignment served as fairly standard discipline. We begin our analysis with the general framework for First Amendment retaliation claims, which applies to both issues one and two.

### III.

### *A.*

The First Amendment applies to the states through incorporation by the Due Process Clause of the Fourteenth Amendment. *Near v. Minnesota* ex rel. *Olson*, 283 U.S. 697, 707, 51 S. Ct. 625, 628 (1931). To state a claim for First Amendment retaliation under § 1983, a plaintiff generally must plead (1) that the plaintiff engaged in constitutionally protected speech, (2) that the "defendant's retaliatory conduct adversely affected the protected speech," (3) and that the retaliatory action caused the adverse effect on plaintiff's speech. *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). We recognize First Amendment retaliation claims because "[t]he Amendment protects not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Echols*, 913 F.3d at 1320 (citation omitted) (internal quotation marks omitted).

The Complaint alleges that Turner announcing his sheriff run constituted constitutionally protected speech. The parties do not contest this point. This Court has previously recognized that "[a]n interest in candidacy, and expression of political views without interference from state officials who wish to discourage that interest and expression, lies at the core of values protected by the First Amendment." *Randall v. Scott*, 610 F.3d 701, 713 (11th Cir. 2010). Therefore, the Complaint alleges constitutionally protected conduct for both issues one and two.

21-11255                Opinion of the Court                21

It is likely that a threat of arrest or reassignment to teleserve would adversely affect this protected speech.[22] "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett*, 423 F.3d at 1254. The threat of arrest is the quintessential retaliatory conduct that would deter a person of ordinary firmness from exercising First Amendment rights. While the teleserve reassignment is a closer case, we assume it would deter a person of ordinary firmness from exercising First Amendment rights because the Complaint fails to plausibly allege causation. *See infra* part IV.

Given the causation requirement to state a § 1983 First Amendment retaliation claim and the large number of people involved in Turner's arrest, overcoming a Rule 12(b)(6) dismissal on issue one necessarily faces difficulty. On appeal, the only remaining defendants alleged to have caused Turner harm are Sheriff Williams and the JSO as a municipal body. And yet, a large cast of characters feature in the facts as alleged in Turner's Complaint.

_____

[22] The Complaint also seems to assert that the denial of Turner's retired deputy card and the refusal to allow him to take a retirement shooting requalification test constituted retaliatory action. But both of those episodes transpired between Turner and the NCSO. Sheriff Leeper of the NCSO denied Turner's request for a retired deputy card, and a different NCSO employee refused Turner's request for a retirement shooting requalification. Without any suggestion that those acts could be attributed to anybody involved in this action other than Sheriff Leeper, we will not address them, as Leeper is no longer a party.

Relevantly, a JSO detective with the Integrity/Special Investigations Unit submitted the affidavit supporting Turner's, Kvies's, and Griffis's arrest warrants. A different officer with the JSO then served that warrant and arrested Turner. An assistant state attorney approved the arrest warrant. And, most importantly, a judge signed the warrant, indicating that probable cause existed to arrest Turner. Williams neither personally arrested Turner nor applied for the arrest warrant.

Vicarious liability does not apply to § 1983 suits. *Iqbal*, 556 U.S. at 676, 129 S. Ct. at 1948. "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* at 677, 129 S. Ct. at 1949.

Beyond bare assertions that "false statements and omissions were made at the direction of JAX SHERIFF and WILLIAMS," and that "[t]he arresting officer was instructed by WILLIAMS not to conduct or failed to conduct a reasonable investigation" to determine the presence of probable cause for Turner's arrest, the Complaint does not connect Williams to the act of arrest or the application for the arrest warrant except by conclusory statements. Even assuming this disconnect is not fatal to the claim, the Complaint also does not allege a connection between Williams and either the assistant state attorney who approved the arrest warrant or the judge who signed it.

"To prevail on [a First Amendment retaliation] claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's

'subsequent injury.'" *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Harman v. Moore*, 547 U.S. 250, 259, 126 S. Ct. 1695, 1703 (2006)). In other words, it is insufficient for the Complaint to allege that Williams "acted with a retaliatory motive" and that Turner was harmed—Williams's "motive must *cause* [Turner's] injury."[23] *Id.* (emphasis in original). This means that, taking Turner's alleged facts as true, it must be plausible that, had Williams not had any ill will toward Turner, the latter would not have been arrested. *Id.* The independent actions of the assistant state attorney and the judge broke any causal chain between Williams's alleged motive and the alleged constitutional tort.

Setting aside the general causation problems with the Complaint under the *Twombly* and *Iqbal* standard, the allegations face a more specific hurdle. In view of the "but-for" cause requirement for a First Amendment retaliatory arrest claim, the Supreme Court has instructed that a plaintiff "must plead and prove the absence of probable cause for the arrest." *Id.* at 1724. Requiring a plaintiff to plead an absence of probable cause keeps the relevant inquiry objective. "Because a state of mind is 'easy to allege and hard to disprove,' a subjective inquiry would threaten to set off 'broad-ranging discovery' in which 'there often is no clear end to the relevant evidence.'" *Id.* at 1725 (quoting *Crawford-El v. Britton*, 523 U.S.

---

[23] Taking the facts as alleged in the Complaint as true, Williams may very well have had a subjective intent to retaliate against Turner, as most evidenced by the conversation between Turner and Ray Bullard.

574, 585, 118 S. Ct. 1584, 1590 (1998) and *Harlow v. Fitzgerald*, 457 U.S. 800, 817, 102 S. Ct. 2727, 2737 (1982)).

This, then, brings us to the dispositive question of this appeal: Was there probable cause to arrest Turner?

### B.

### 1.

The Fourth Amendment protects against unreasonable searches and seizures, and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. To ensure that warrants are not issued without probable cause, the "law requires that a warrant for an arrest be supported by 'sufficient information to establish probable cause.'" *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019) (quoting *Holmes v. Kucynda*, 321 F.3d 1069, 1083 (11th Cir. 2003)). In analyzing whether an officer arrested someone with probable cause, we ask "whether a reasonable officer could conclude . . . that there was a substantial chance of criminal activity." *Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022) (internal quotation marks omitted) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018)).

Probable cause only requires that there be a substantial chance of criminal activity. We do not require there be proof beyond a reasonable doubt of an arrestee's guilt, or even that there be a preponderance of evidence to support arrest. In other words, "[p]robable cause 'is not a high bar.'" *Wesby*, 138 S. Ct. at 586

(quoting *Kaley v. United States*, 571 U.S. 320, 338, 134 S. Ct. 1090, 1103 (2014)).  Since the Complaint must allege a lack of probable cause, Turner faces a high bar.  That bar only rises higher by the fact that Turner was arrested under the authority of a warrant.

"At the Founding, the presence of a valid arrest warrant made an arrest reasonable."  *United States v. Phillips*, 834 F.3d 1176, 1180 (11th Cir. 2016).  However, "[t]he Warrants Clause requires every warrant to be particular, sworn, and supported by probable cause."  *Id.*  Therefore, an arrest warrant creates a presumption, albeit a rebuttable one, that probable cause existed for the arrest.  This presumption derives from the "[g]reat deference [] accorded" a judicial determination of probable cause.  *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991).  To inquire as to probable cause when a person is arrested pursuant to a warrant is to look behind the warrant to the information presented to the signing judge.  We begin by asking whether the warrant affidavit possessed an intentional or reckless misstatement or omission.  *Paez*, 915 F.3d at 1287.  If the affidavit contained any such misstatements or omissions, we next ask "whether probable cause would be negated if the offending statement was removed or the omitted information included" to determine the materiality of the error.  *Id.*

Under step one, it is not enough that imperfect information or information ultimately discovered to be incorrect infected the warrant affidavit.  Rather, the person attacking a warrant affidavit must allege "deliberate falsehood or [] reckless disregard for the

truth."[24] *Franks v. Delaware*, 438 U.S. 154, 171, 98 S. Ct. 2674, 2684 (1978). Turner's Complaint points to four alleged misstatements and omissions in the warrant affidavit. We address all four in turn—first for their falsity, then for their materiality. Even at a motion to dismiss stage, Turner carries the burden of pointing to what intentionally or recklessly false information went into the warrant affidavit. Otherwise, the presumption that the warrant validly issued, and thus that probable cause existed, must stand.

2.

First, the Complaint alleges that Turner's "acknowledgement that there was beer in the car upon being asked by" his lieutenant and sergeant immediately after the OIS was omitted from the warrant affidavit. We can assume that the affiant detective intentionally omitted this encounter from the affidavit, though Turner does not allege the affiant knew about Turner's interview. But while it is odd that the affidavit does not mention the post-OIS debrief, the omission is immaterial.

---

[24] The other route to defeat probable cause is to show that the signing judge failed to "perform his neutral and detached function" and "serve[d] merely as a rubber stamp for the police." *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S. Ct. 1509, 1512 (1964) (internal quotation marks omitted), *abrogated on other grounds*, *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317 (1983); *see also United States v. Leon*, 468 U.S. 897, 914, 104 S. Ct. 3405, 3416 (1984). With the exception of asserting in a conclusory fashion that the judge who signed Turner's arrest warrant acted as a "rubber stamp," the Complaint does not allege that the judge did not perform in a neutral and detached fashion.

Turner was arrested in violation of Fla. Stat. §§ 918.13[25] and 777.04(3)[26] for tampering with evidence and conspiracy to do the same. According to the facts in the Complaint, before the OIS, Turner, Kvies, and Griffis had placed beer props in the car. After the OIS, but before other officers arrived and began asking questions, Kvies and Griffis, with at least the tacit approval of Turner, removed the beer props and disposed of them away from the vehicle. When asked if the officers had been drinking, Turner told his lieutenant and sergeant that there were beer props in the Jeep Cherokee. The affidavit omits this conversation, and instead relays that Kvies and Griffis did not reveal that they had beer props or that the beer props had been removed in their post-OIS interviews.

---

[25] Fla. Stat. § 918.13 stated at the time of Turner's arrest:

> (1) No person, knowing that a criminal trial or proceeding or an investigation by a duly constituted prosecuting authority, law enforcement agency, grand jury or legislative committee of this state is pending or is about to be instituted, shall:
>
> > (a) Alter, destroy, conceal, or remove any record, document, or thing with the purpose to impair its verity or availability in such proceeding or investigation; or
> >
> > (b) Make, present, or use any record, document, or thing, knowing it to be false.

Fla. Stat. § 918.13(1) (amended 2022 by 2022 Fla. Laws 2022-084).

[26] Fla. Stat. § 777.04 states: "A person who agrees, conspires, combines, or confederates with another person or persons to commit any offense commits the offense of criminal conspiracy." Fla. Stat. § 777.04(3).

While a criminal trial for Turner's evidence tampering charge would have required a prosecutor to prove a mental state, it is unnecessary for the judge to have all potentially relevant information regarding Turner's mental state to make a probable cause determination. Remember, the judge is only looking for a *substantial chance* that Turner committed a crime. Whether or not the judge knew that Turner told JSO officers that there was beer in the car after the OIS has no bearing on the determination that there was a substantial chance Turner tampered with evidence *before* that interaction. Therefore, the omission of this conversation was immaterial.

Second, the Complaint also alleges that the affidavit not mentioning that Turner was interviewed at all the night of the OIS was a material omission. As already discussed, inclusion of the interview is not material to the judge's probable cause determination that actions taken before the interview constituted a crime.

Third, the Complaint alleges the affidavit omitted the fact that "beer props were authorized in the vehicle for undercover officers." However, Turner's counsel acknowledged at oral argument that this is incorrect.[27] The affidavit states that "detectives

---

[27] Even if Turner's counsel never acknowledged the inconsistency, this allegation would still fail. In general, courts only consider the four corners of a complaint and the complaint's attached exhibits when analyzing a Rule 12(b)(6) motion to dismiss. *Fuller v. SunTrust Banks, Inc.*, 744 F.3d 685, 695–96 (11th Cir. 2014); *see also* Fed. R. Civ. P. 10(c). If an exhibit attached to a complaint contradicts the allegations about the exhibit set forth in the

21-11255                Opinion of the Court                29

are allowed by policy to have 'props' to include beer while they are working." This assertion of falsity therefore fails.

Fourth, and most seriously, the Complaint alleges that the affidavit's statement that "Turner was re-interviewed by [the] affiant" was a material misstatement. The affidavit maintains that at this interview, "Turner admitted that he did tell Kvies to discard the beer cans." Turner's Complaint, on the other hand, says that Turner was only interviewed once—the omitted interview—and he never admitted to discarding beer cans in that interview. Standing alone, this would certainly rise to the level of a material misstatement. However, in determining probable cause, we must look at "the body of evidence as a whole" to determine if there was a substantial chance a crime had been committed. *Paez*, 915 F.3d at 1286. In other words, if we remove this misstatement, do we still have probable cause? We do.

---

complaint itself, the exhibit controls. *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016). "As our predecessor court warned nearly 80 years ago, a 'litigant may be defeated by his own evidence, the pleader by his own exhibits' when 'he has pleaded too much and has refuted his own allegations by setting forth the evidence relied on to sustain them.'" *Gill* ex rel. *K.C.R. v. Judd*, 941 F.3d 504, 511 (11th Cir. 2019) (emphasis omitted) (quoting *Simmons v. Peavy-Welsh Lumber Co.*, 113 F.2d 812, 813 (5th Cir. 1940)).

Turner's Complaint had attached a copy of the Affidavit for Arrest Warrant presented to the judge to secure the warrants for his, Kvies's, and Griffis's arrests. The affidavit therefore forms part of the Complaint and controls even where the Complaint itself says something different.

From the affidavit, the judge learned that Kvies admitted to removing the beer props, Griffis admitted to knowing that the beer props were removed from the vehicle, and Turner was with these two officers on the night of the OIS. The Complaint does not contend that the affidavit falsely presented any of this information to the judge. This information may not constitute probable cause on its own, but the affidavit also quotes material from the iPhone recording Kvies created while the officers disposed of the beer props. Though Turner's Complaint describes the contents of the iPhone recording differently, it does not assert that the quotes in the affidavit are incorrect.[28] This information, without the misstatement, sufficiently underlies a determination that there was a substantial

---

[28] The parties dispute whether the District Court properly considered the contents of the iPhone recording since the recording was attached to Williams's motion to dismiss rather than to the Complaint itself. Turner practically invited the Court to do so by quoting from it in his Complaint and challenging an affidavit that relied on it. Nevertheless, because the Complaint never alleges that the affidavit mischaracterized the iPhone recording, it is unnecessary to consult the actual recording at all. The Complaint can only negate probable cause if it points to an intentional or reckless misstatement or omission in the affidavit. Though it presents a different interpretation of the iPhone audio, Turner's Complaint does not allege that the swearing detective intentionally or recklessly misrepresented the recording's contents to the judge, thus causing the judge to make the probable cause determination based on incorrect information. And we can of course consider the affidavit itself in reviewing the probable cause determination because Turner attached it to his Complaint. *See* Fed. R. Civ. P. 10(c).

chance Turner participated in the evidence tampering. Therefore, even this misstatement was immaterial.

3.

Beyond the above-mentioned alleged misstatements and omissions in the warrant affidavit, Turner makes three types of arguments to support his assertion that there was no probable cause to arrest him. First, Turner's Complaint alleges many times that Turner could not possibly have possessed the requisite intent to violate the evidence tampering statute. Second, because the Jeep Cherokee does not appear to have been processed as evidence—due to the next officers to check out the vehicle finding the cocaine from the night of the OIS still on the floorboard—the charge itself was disingenuous. Third, because JSO policy allowed beer props in the car, removing them from the vehicle post-OIS could not possibly constitute tampering with evidence.

The third argument is not particularly availing given that the affidavit informed the judge, while making the probable cause determination, that beer props were authorized to be in the vehicle. The intent and lack of investigation arguments would have been incredibly useful to Turner had he been prosecuted. But their presence in the Complaint reveals the yawning gap between proving someone's guilt of a crime beyond a reasonable doubt and showing probable cause—or a substantial chance someone committed a crime.

If the judge acted reasonably in concluding that a crime was committed based on the totality of the evidence at the time, then "the presence of some conflicting evidence or possible defense will not vitiate a finding of probable cause." *Paez*, 915 F.3d at 1286. And an officer or judge, in determining the existence of probable cause, "need not take 'every conceivable step . . . at whatever cost, to eliminate the possibility of convicting an innocent person.'" *Rankin v. Evans*, 133 F.3d 1425, 1436 (11th Cir. 1998) (quoting *Tillman v. Coley*, 886 F.2d 317, 321 (11th Cir. 1989)).  They also need not "resolve every inconsistency found in the evidence." *Paez*, 915 F.3d at 1286.

Specifically with regard to the warrant affiant not presenting the judge with Turner's post-OIS interview, probable cause does not require the judge to rule out "a suspect's innocent explanation for suspicious facts." *Wesby*, 138 S. Ct. at 588.  And, again, as long as the totality of the evidence points to a substantial chance of a crime, an officer is not "required to sift through conflicting evidence or resolve issues of credibility." *Huebner v. Bradshaw*, 935 F.3d 1183, 1188 (11th Cir. 2019) (internal quotations omitted) (quoting *Dahl v. Holley*, 312 F.3d 1228, 1234 (11th Cir. 2002), *abrogated on other grounds by Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018)).

"The Constitution does not guarantee that only the guilty will be arrested." *Baker v. McCollan*, 443 U.S. 137, 145, 99 S. Ct. 2689, 2695 (1979).  It only provides protection against being arrested without probable cause.  Turner presents many good

reasons why he should not be found guilty of evidence tampering. As demonstrated by the assistant state attorney's decision not to prosecute, these arguments would likely have found success in a criminal trial. None of Turner's arguments, however, alone or collectively, negates the fact that it was objectively reasonable to determine that there was a substantial chance Turner committed a crime at the time the judge signed the arrest warrant. Turner's Complaint, therefore, fails to plausibly allege an absence of probable cause. In fact, probable cause affirmatively existed to arrest Turner.

## C.

While we conclude that Turner's Complaint fails to plead the absence of probable cause required by *Nieves*, the Supreme Court provides two narrow exceptions where a plaintiff need not carry that burden. The first is "when the 'unique' five factual circumstances" from *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018), are all present. *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1297 (11th Cir. 2019). The second "is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019). To avail himself of this second exception, a plaintiff must present "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.*; *see also DeMartini*, 942 F.3d at 1297. We analyze the *Lozman* exception

first, then move on to determining whether Turner's Complaint alleges that he was arrested where similarly situated individuals were not.

1.

Because we have already decided that Turner's Complaint does not adequately allege an absence of probable cause, we look to the five considerations the Supreme Court analyzed in *Lozman*:

> (1) plaintiff Lozman had alleged "more governmental action than simply an [officer's] arrest" because he claimed that the City "itself retaliated against him pursuant to an 'official municipal policy' of intimidation"; (2) the plaintiff had alleged that the City's retaliation plan was "premeditated" and formed months earlier (before the arrest); (3) the plaintiff had "objective evidence" of a policy motivated by retaliation, as he had a transcript of a closed-door meeting where a Councilmember stated that the City should use its resources to "intimidate" Lozman and others who filed lawsuits against the City; (4) there was less of a concern about the causation problem and opening the floodgates of frivolous retaliation claims because the City's official policy of retaliation was formed months earlier, there was little relation between the "protected speech that prompted the retaliatory policy and the criminal offense (public disturbance) for which the arrest was made," and "it was unlikely that the connection between the alleged animus and injury will be weakened by an official's legitimate

consideration of speech"; and (5) the plaintiff's speech—the right to petition—was "one of the most precious of the liberties safeguarded by the Bill of Rights" and was "high in the hierarchy of First Amendment values."

*DeMartini*, 942 F.3d at 1294 (alterations in original) (emphasis omitted) (quoting *Lozman*, 138 S. Ct. at 1949, 1954–55).

Turner's circumstance matches the first consideration. The Complaint alleges more than that he was arrested. As previously discussed, Turner's Complaint alleges that the announcement of his Nassau County sheriff run brought down on him retaliation in the form of the arrest and the relegation to teleserve duties for the rest of his career, as well as a denial of a retired deputy card from the NCSO and refusal to attempt the retirement shooting requalification with the NCSO. The allegations span two police departments and amount to much more than that Turner was arrested because of his speech.

Turner's Complaint does not allege enough to satisfy the second consideration, however. The Complaint states multiple times that the "timeline of events makes it clear" that Williams planned to and did retaliate against Turner. But these statements are conclusory and not entitled to a presumption of truth at the Rule 12(b)(6) stage. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009). Turner's Complaint alleges two alternative theories, however, that come close but fail to allege a premeditated plan.

For one, the Complaint presents Turner's conversation with Ray Bullard after the OIS, but before Turner's arrest. The gist of that conversation, as alleged in the Complaint, is that Bullard heard Henderson (Turner's potential opponent in the race for Nassau County sheriff) say that Williams was working with Leeper to scuttle Turner's candidacy. Assuming *arguendo* that the multiple levels of hearsay make no difference to the plausibility of this claim, this allegation is not enough to satisfy factor two.

In *Lozman*, the plaintiff alleged the city formulated a plan of retaliation months before his arrest. 138 S. Ct. at 1949, 1954. The plaintiff also alleged the city formed the plan before the act that supposedly served as the basis for the crime for which he was arrested. *Id.* at 1949. The reason the Supreme Court found the temporal gap between the plan to retaliate and the actual arrest important was to target pretextual arrests for § 1983 liability and weed out arrests upon legitimate considerations. *Id.* at 1954. When the alleged retaliatory plan falls between the arrestable conduct and the arrest, rather than before the arrestable conduct, the presence of a plan becomes less severable from legitimate considerations for the arrest.

Turner's Complaint does not allege egregious premeditation like the Court found in *Lozman,* and the two possible allegations of a plan may have occurred after the OIS. The Complaint does not identify when the remarks Bullard overheard Henderson making took place. For all a reader knows, Bullard could have told Turner of his findings the day after he heard them. This would

place Henderson's remarks before Turner's arrest but after the actions for which Turner was arrested (disposing of the beer props after the OIS). Thus, even giving the Complaint the benefit of the doubt and assuming the most dastardly motivations for Williams and Leeper, this allegation does not lead inextricably to the inference that Williams premeditated a plan of retaliation. If the alleged conversation took place after the OIS, Bullard might have just heard Henderson relishing the fact that there was a substantial chance his political opponent had committed a crime and would therefore no longer be an obstacle to winning the sheriff position.

The other allegation the Complaint makes that could go to consideration two is an alleged round table discussion between Williams, Volgalsang (the Fraternal Order of Police lawyer representing Turner's interests), and two other senior officers with the JSO to "decide to arrest [Turner] and decide[] to investigate, arrest and otherwise retaliate against [Turner] long before obtaining probable cause and in spite of the lack of probable cause for arrest of [Turner]." This allegation fails, however, for similar reasons that the alleged overheard conversation Bullard reported to Turner fails.

There is no indication when this meeting happened. Though the Complaint says it took place "long before" obtaining probable cause, the Complaint also repeatedly asserts—including in the same sentence—that there was never probable cause to arrest Turner. Thus, the assertion that the meeting took place long before probable cause existed does little to place the meeting on a

timeline of the allegations.  With that ambiguity, taking the Complaint's well-pled allegations as true, this meeting could have occurred after the OIS, but before Turner's arrest.  In that case, a meeting that included top JSO leadership and the Fraternal Order of the Police lawyer not only looks completely innocuous but makes perfect sense.  JSO leadership would have acted reasonably by discussing the possibility of arresting fellow police officers for tampering with evidence in what was, in part, an internal investigation.  Such a meeting does not make a "plausible suggestion" that Williams and the JSO leadership concocted a retaliation plan months before the arrest like in *Lozman*.  *Twombly*, 550 U.S. at 566, 127 S. Ct. at 1971.  Therefore, Turner's Complaint does not satisfy consideration two since the allegations, assuming the worst intent, are just as consistent with beneficial timing for Henderson and normal police leadership as they are for a conspiracy to snuff out Turner's candidacy.  *Id.* at 554, 127 S. Ct. at 1964 (finding allegations consistent with conspiracy but also consistent with lawful behavior inadequate).

Because Turner appeals a Rule 12(b)(6) dismissal, consideration three should not require Turner to actually produce objective evidence.  But the Complaint does not even allege the existence of objective evidence of a policy to retaliate like that present in *Lozman*.  The plaintiff in *Lozman* pointed to a transcript where a city councilmember announced the governing body's intention to retaliate against him.  138 S. Ct. at 1949.  Here, the Complaint only points to a round table meeting with little by way of

contextualizing facts (when it took place) and a conversation that a third-party (Bullard) overheard that included discussion of the defendants' motives. Of course, we do not know if Henderson's overheard conversation was with Williams or Leeper, or if it was just about them. This falls far short of the objective evidence needed to satisfy *Lozman*'s narrow exception.

The Complaint may have alleged enough to fulfill consideration four. One of the sub-elements of the factor does not even apply to Turner's situation. Unlike in *Lozman*, there could be no legitimate consideration of Turner's running for sheriff in the decision to arrest him for tampering with evidence. *See id.* at 1954. But, similar to *Lozman*, there is little relation between Turner's protected speech and the arrest. *See id.* And it is unlikely that the success of Turner's suit would open the floodgates of litigation because it is improbable that a decision for Turner would unleash a torrent of arrested political candidates pursuing § 1983 damages.

Turner's Complaint may also satisfy the fifth consideration, but it certainly weighs less strongly here than it did in *Lozman*. We will not engage in a full analysis of the "hierarchy of First Amendment values," but if the right to petition one's government lies at the heart of our country's free speech protections, the right to run for office must come in somewhere lower on the list. *Id.* at 1955.

Since *Lozman* only provides a narrow exception, it is not enough that the Complaint's allegations satisfy up to three of the five considerations the Supreme Court weighed in deciding *Lozman*. The Complaint's allegations must satisfy all of them. Due to

the lack of allegations pointing to objective evidence of a retaliatory plan and an absence of allegations indicating that Williams cooked up such a plan well in advance of the arrestable conduct, Turner cannot avail himself of the *Lozman* exception to having to allege an absence of probable cause.

2.

Turner's Complaint also alleges facts that could go to the differential treatment exception to *Nieves*'s requirement that plaintiffs allege and prove an absence of probable cause for a First Amendment retaliatory arrest claim. This exception "is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so," *Nieves*, 139 S. Ct. at 1727, and requires "objective evidence that [Turner] was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* The Complaint points to nine other officers who had been caught tampering with evidence. According to the Complaint, none of them were ever arrested for their conduct, but most of them were temporarily assigned to teleserve. While there was allegedly a substantial chance each of the nine individuals committed the crime of tampering with evidence and yet were not arrested, Turner's list of comparators ignores the two closest comparators: Kvies and Griffis. They were arrested. In fact, a single warrant affidavit led to Kvies's, Griffis's, and Turner's arrests. Although the Complaint says the two junior officers were arrested "for the sole purpose of arresting Plaintiff without it appearing suspect," this is indisputably

conclusory.  There was just as much probable cause to arrest the two of them as there was to arrest Turner.

This differential treatment exception is also narrow and requires objective evidence.  Still taking the Complaint's allegations as true, there are two reasons why this exception cannot apply here.  First, all three of the undercover officers from the OIS were arrested, not just Turner.  Turner was therefore treated the same as the most similar comparators.  Second, almost all of the comparators Turner mentions received some sort of punishment.  While not arrested, these past comparators make clear that evidence tampering is not merely an offense in name that often goes overlooked. *See, e.g., State v. Jennings*, 666 So. 2d 131 (Fla. 1995) (reviewing an arrest under Fla. Stat. § 918.13 for evidence tampering); *Costanzo v. State*, 152 So. 3d 737 (Fla. 4th Dist. Ct. App. 2014) (reviewing a conviction under the evidence tampering statute); *E.I. v. State*, 25 So. 3d 625 (Fla. 2d Dist. Ct. App. 2009) (reviewing an adjudication of delinquency under the same).

Since Turner's Complaint does not adequately allege an absence of probable cause—in fact, we find as a matter of law that there was probable cause to arrest Turner—and the Complaint does not allege facts sufficient to satisfy either the *Lozman* or the differential treatment exceptions, Turner's § 1983 First Amendment retaliation claim against Williams based on Turner's arrest was properly dismissed by the District Court as failing to state a claim.  Since Turner's Complaint does not allege facts sufficient to plausibly show that his arrest was retaliatorily at all, the First

Amendment retaliation claim against Williams in his official capacity must consequently fail as well.  An official policy cannot be the "moving force" of a constitutional violation if there is no constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2038 (1978).

Turner's claims asserting a false imprisonment/arrest claim under Florida common law against Williams in his official and individual capacities also fall with the First Amendment retaliation claim.  "[P]robable cause constitutes an absolute bar to both state and § 1983 claims alleging false arrest," and since we found probable cause here, the common law claims also fail to state a claim for relief. *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998).  While probable cause is an affirmative defense to Florida's false arrest claim, probable cause existed to arrest Turner as a matter of law. *See id.* at 1436.  Further, Turner was arrested pursuant to a valid warrant signed by a judge.  His arrest, therefore, could not possibly have been "false." *See Johnson v. Weiner*, 19 So. 2d 699, 700 (Fla. 1944) (stating that imprisonment under legal authority cannot be false).  Therefore, the District Court properly dismissed the common law false arrest claims as well.  Thus, Turner's Complaint fails to state a plausible claim for relief on issue one.

## IV.

Turner's Complaint also alleges that Turner's assignment to teleserve after the assistant state attorney declined to prosecute constituted retaliatory conduct for Turner's protected speech. "The requisite 'causal relation' for a § 1983 claim 'does not exist

when the continuum between Defendant's action and the ultimate harm is occupied by the conduct of deliberative and autonomous decision-makers.'" *Carruth v. Bentley*, 942 F.3d 1047, 1056 (11th Cir. 2019) (quoting *Dixon v. Burke Cnty.*, 303 F.3d 1271, 1275 (11th Cir. 2002)). Since we have already decided that there was probable cause to arrest Turner, and the arrest was ultimately effectuated by an independent assistant state attorney and independent judge, the independent actions broke the causal chain between any retaliatory animus on Williams's part and the teleserve reassignment.

Though charges were never proven in a criminal setting, it is not outrageous that an officer who had been arrested in connection with an OIS would be reassigned to a less public-facing role within the police force. And though this is not fleshed out in the Complaint, the reassignment decision could plausibly have had something to do with the OIS itself. We do not know. The allegations are merely consistent with liability; they do not make entitlement to relief plausible. *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. There are too many potential factors in this decision for us to say, even taking all of the Complaint's factual allegations as true, that but for Williams's alleged retaliatory animus, Turner would not have been reassigned. *Nieves*, 139 S. Ct. at 1722 (requiring but-for causation between a defendant's retaliatory animus and a plaintiff's injury).

The comparators do not help Turner here either. Most of the officers the Complaint mentions were reassigned to teleserve as part of their tampering with evidence discipline. Though the

Complaint alleges all these reassignments were temporary, Turner resigned before he could have potentially discovered that his reassignment would ultimately have been temporary as well. Therefore, the District Court properly dismissed Turner's § 1983 First Amendment retaliation claim against Williams in his individual capacity for the teleserve reassignment as failing to state a plausible claim for relief. Concomitantly, because we find no retaliation in the reassignment, the District Court also properly dismissed the official capacity claim. Thus, the Complaint fails to state claims for relief as to issue two as well.

## V.

Finally, Turner alleges a Florida common law conspiracy claim against Leeper and Williams in their individual capacities, presumably for both the alleged arrest and teleserve harms. "[A]n actionable conspiracy requires an actionable underlying tort or wrong." *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 764 F.3d 1327, 1339 (11th Cir. 2014) (internal quotations omitted) (quoting *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d Dist. Ct. App. 1997)). Since we have found no underlying tort in either the arrest or the reassignment, the District Court properly dismissed the conspiracy claim as failing to allege a plausible claim for relief.

## VI.

Because Turner's Complaint does not plausibly allege an absence of probable cause for his arrest, that Turner satisfies either of the two exceptions to carry that burden, or a plausible connection

between his election announcement and teleserve reassignment, we affirm the District Court's dismissal of Turner's Second Amended Complaint under Rule 12(b)(6).

**AFFIRMED.**