[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-10059

Non-Argument Calendar

_____

ANDREW W. BELL,

Plaintiff-Appellant,

*versus*

SECRETARY OF STATE FOR THE STATE OF GEORGIA,
DIRECTOR OF ELECTIONS FOR THE STATE OF GEORGIA,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cv-02486-SEG

_____

Before JILL PRYOR, NEWSOM, and ANDERSON, Circuit Judges.

PER CURIAM:

In 2020, Andrew W. Bell submitted a nomination petition to the Georgia Secretary of State, seeking to add his name to the ballot as an independent candidate in an upcoming election for the Georgia House of Representatives. The Secretary of State determined that Bell failed to submit the required number of signatures to appear on the ballot. Bell then sought review of that decision by filing a mandamus petition in superior court. After the superior court denied Bell relief and the Georgia Supreme Court dismissed his appeal, he filed a lawsuit in federal court against Brad Raffensperger, Georgia's Secretary of State, and Chris Harvey, Georgia's Director of Elections at the time Bell submitted his nomination petition. In a thorough and well-reasoned order, the district court dismissed Bell's complaint. We affirm.

## I.

In 2020, Bell sought to run as an independent candidate for the Georgia House of Representatives in District 85, which is located in DeKalb County. To have his name appear on the ballot as an independent candidate, Bell had to submit a nomination petition to the Secretary of State.

The nomination petition required signatures from 1,255 individuals registered to vote in District 85. Georgia law generally requires an independent candidate seeking to have his name

included on the ballot for a non-statewide election to obtain signatures from a number of registered voters in the district equal to 5% of the total number of registered voters eligible to vote in the last election for that office. *See* O.C.G.A. § 21-2-170(b). To meet this requirement, Bell would have had to submit 1,793 signatures. However, for the 2020 general election, because of the COVID-19 pandemic, a court decreased the number of signatures an independent candidate had to submit by 30%, reducing the signature requirement for candidates for non-statewide office from 5% to 3.5%. *See Cooper v. Raffensperger*, 472 F. Supp. 3d 1282, 1296 (N.D. Ga. 2020). Under Georgia law, Bell's nomination petition was due to the Secretary of State by July 14, 2020. *See* O.C.G.A. § 21-2-132(e). But due to the COVID-19 pandemic, the Secretary of State extended the deadline to August 14.

On August 13, Bell submitted a nomination petition to the Secretary of State's office with 2,200 signatures. Georgia law required the Secretary of State to "expeditiously . . . examine" the petition to determine whether it contained the required number of signatures. *Id.* § 21-2-171(a), (b). Despite the mandate to act quickly, the Secretary of State's office took approximately three weeks to review the signatures.[1] Upon review, it determined that Bell had submitted only 827 valid signatures and thus would not appear on the ballot for the District 85 general election.

---

[1] The only explanation in the record for the delay is that the attorney in the Secretary of State's office who reviewed the petition had taken a vacation.

Shortly before the close of business on Friday, September 4, Bell received an email notifying him of the decision from the Secretary of State's office with a letter from Harvey, the elections director. Although Bell received the email on September 4, 2020, the letter from Harvey was dated August 28, 2018. In addition, the letterhead identified Brian Kemp as the Secretary of State, even though he was no longer the Secretary of State; Raffensperger held the office. By the time Bell received the email, there was only one week until the deadline for elections officials to finalize the ballots for the general election.[2]

On the next business day, September 8, Bell, proceeding *pro se*, filed an emergency application for a writ of mandamus in Fulton County Superior Court, seeking review of the Secretary's decision. *See id.* § 21-2-171(c) (providing that the denial of a nomination petition may be reviewed by filing an application for a writ of mandamus in superior court "within five days of the time when the petitioner is notified of such decision"). He asked the court to order Raffensperger to certify that Bell was an independent candidate for District 85 and issue an injunction either prohibiting Raffensperger from printing ballots for the general election in District 85 without

---

[2] Under federal law and Georgia law, election officials must transmit absentee ballots to eligible voters at least 45 days before the general election. *See* 52 U.S.C. § 20302(a)(8)(A); O.C.G.A. § 21-2-384(a)(2). To have ballots printed and ready to be mailed by this deadline, the Secretary of State required ballots to be finalized by September 11.

23-10059                Opinion of the Court                      5

Bell's name or requiring Raffensperger to place Bell's name on the ballot.

The superior court held a hearing on Bell's application for a writ of mandamus on September 15, which was after the deadline for ballots to be finalized.[3] Two days after the hearing, the superior court issued an order denying the application for a writ of mandamus. It concluded that Bell failed to demonstrate that he had submitted 1,225 valid signatures from voters in District 85 and thus had not shown that his nomination petition was denied in error.

About a week later, Bell appealed to the Georgia Supreme Court. Several months afterward, in May 2021, the Court dismissed the appeal as moot. *See Bell v. Raffensperger*, 858 S.E.2d 48, 51 (Ga. 2021). It explained that Bell had asked it "to reverse the trial court's order and direct the trial court to . . . either compel the Secretary to put his name on the November 3, 2020 general election ballot or prohibit the Secretary from printing ballots without his name on them." *Id.* In effect, Bell sought "to stop the printing of ballots that have already been printed, cast, and counted" and to require the

---

[3] Under Georgia law, the court could not schedule the hearing any earlier. When a state official is sued in his official capacity, the State generally must receive at least five days' written notice of a hearing. *See* O.C.G.A. § 9-10-2 (providing that judicial action in a case where a state official in his official capacity is a party generally is "void unless it affirmatively appears as a matter of record" that the Attorney General received "five days' advance written notice" of the hearing that resulted in the judicial action); *see also Ga. Dep't of Agric. v. Griffin Indus.*, 644 S.E. 2d 286, 289 (Ga. Ct. App. 2007) (discussing notice requirement).

Secretary of State "to place his name on a ballot that no longer exists for an election that has already occurred." *Id.* Because it was "no longer capable of granting the type of relief Bell request[ed]," the Georgia Supreme Court concluded that the appeal was moot. *Id.*

The Court noted that Georgia law generally requires it to "announce its decision" in an appeal reviewing the denial of a nomination petition "within such period of time as will permit the name of the candidate affected by the court's decision to be printed on the ballot if the court should so determine." *See id.* at 50 n.3 (quoting O.C.G.A. § 21-2-171(c)). The Georgia Supreme Court acknowledged that it had not issued its decision within this time period. *Id.* But it explained that by the time Bell's appeal was docketed and he submitted a brief enumerating as error the superior court's decision on a nomination petition, "his appeal was already moot." *Id.* The Georgia Supreme Court also "emphasize[d]" that a party seeking to rely on the expedited-review provision for decisions regarding nomination petitions must "alert the Court" to his request for expedited review by filing a motion for expedited appeal citing § 21-2-172(c). Bell had filed no such motion and had not requested expedited review under § 21-2-172(c) in his initial appellate brief. *Id.*

Approximately one month after the Georgia Supreme Court dismissed his appeal, Bell, again proceeding *pro se*, filed a lawsuit in federal district court. He filed a pleading labeled "Petition for Writ of Mandamus" and named Raffensperger and Harvey (together, the "elections officials") as defendants. In the petition, Bell claimed

that he had submitted "more than the required number of signatures" to the Secretary of State and should have been included on the ballot for the general election in District 85 as an independent candidate. Doc. 3 at 17.[4] He asked the district court to issue a writ of mandamus and "set aside" the superior court's order denying him relief as well as the Georgia Supreme Court's decision dismissing his appeal. *Id.* at 3. He also asked the district court to order a new election for District 85 in which his name would appear on the ballot.

In the petition, Bell also raised constitutional challenges to aspects of Georgia's statutory scheme related to nomination petitions. He claimed that the requirement that candidates for non-statewide office submit signatures from 5% of registered voters in the district was unconstitutional. Bell argued that this requirement imposed a "severe burden" on independent candidates because of the difficulty involved in collecting signatures. *Id.* at 14. He also pointed out that independent candidates for statewide office were required to submit signatures from just 1% of registered voters in Georgia to appear on the ballot. Bell asserted that it violated equal protection principles to apply different signature requirements to independent candidates running for non-statewide and statewide offices.

In addition, he challenged the statutory requirement that candidates whose nomination petitions were denied must seek

---

[4] "Doc." numbers refer to the district court's docket entries.

judicial review in superior court within five days of the Secretary of State's decision. Bell claimed that the five-day time period imposed a substantial burden because it did not give a candidate "enough time to consult with or hire an attorney" before applying for a writ of mandamus in superior court. *Id.* at 13.

Besides these challenges, Bell claimed that he was denied due process because of irregularities that occurred when the Secretary of State reviewed his nomination petition and in the state court litigation that followed. Bell asserted that the Secretary of State's office had delayed reviewing his nomination petition and that by the time he was notified of its decision that he would not appear on the ballot, there was not enough time for him to seek judicial review before ballots had to be finalized. Bell also argued that the superior court and Georgia Supreme Court "should have moved in a more expeditious manner" once he sought judicial review. *Id.* at 11.

The election officials moved to dismiss. After the parties had fully briefed the motion to dismiss, Bell sought leave to amend his complaint to add a demand for compensatory and punitive damages.

The district court granted the election officials' motion to dismiss and denied Bell's motion seeking leave to amend. Given Bell's *pro se* status, the district court liberally construed his "Petition for Writ of Mandamus" as a complaint raising four claims: (1) a request for mandamus relief in which Bell asked the district court to set aside the superior court's order denying his application for a

writ of mandamus as well as the Georgia Supreme Court's decision dismissing his appeal and to order a new election with Bell's name on the ballot; (2) a facial constitutional challenge to Georgia's signature requirement for nomination petitions; (3) a facial constitutional challenge to the five-day period within which an independent candidate must seek review of a nomination petition denial; and (4) a claim alleging that he was denied due process because he did not receive a timely hearing after his nomination petition was denied.[5] The court concluded that each claim was due to be dismissed.

The court began with Bell's claim requesting that it set aside the state court decisions. It construed this claim as alleging that Bell submitted enough valid signatures to qualify as an independent candidate and seeking to have the district court "review and invalidate the orders entered by the Georgia state courts." Doc. 33 at 15–16. The district court concluded that the *Rooker-Feldman* doctrine barred it from reviewing this claim.[6]

---

[5] Bell attached several documents to his petition, including Harvey's letter notifying Bell that his nomination petition had been denied, Bell's application for a writ of mandamus filed in superior court, the transcript of the superior court hearing, and the superior court's order. The district court treated these documents as part of the complaint. *See MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th 1295, 1303 (11th Cir. 2022) (explaining that an attachment to a complaint generally is treated as part of the complaint).

[6] *Rooker-Feldman* is a jurisdictional doctrine derived from two Supreme Court cases: *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

Bell argued that the *Rooker-Feldman* doctrine did not bar review because the state court decisions had been procured by fraud. To support his claim of fraud, Bell pointed to Harvey's letter, which was dated 2018 (not 2020) and identified Kemp (not Raffensperger) as the Secretary of State. The district court rejected this argument, explaining that even if there were a fraud-on-the-court exception to the *Rooker-Feldman* doctrine, Bell's allegations were insufficient to support an inference that these errors resulted from a "fraud-on-the-court, rather than mere clerical oversight." *Id.* at 16.

The court also concluded that Bell's request for an injunction requiring the election officials to place his name on the ballot for an election in District 85 was moot. The court explained that Bell's request for this relief had "been mooted by the passage of time" because the court could not grant injunctive relief "with respect to an election that has already happened." *Id.* at 17, 19.

The court considered whether the case was not moot under the capable-of-repetition-yet-evading-review exception. It acknowledged that Bell had alleged that he intended to run again as an independent candidate and would face similar ballot-access restrictions in a future election. But even considering these allegations, the court concluded that the exception did not apply because the allegations in the amended complaint did not support an inference that Bell would "be subject to the same unique circumstances" that he faced in 2020. *Id.* at 19. These circumstances included the Secretary of State extending the deadline for submitting nominations petitions, which resulted in a "shortened period

between the petition deadline and the ballot printing deadline," and the delay in the review of Bell's nomination petition arising from a Secretary of State staff member being out of town. *Id.*

The district court next considered Bell's constitutional challenge to Georgia's 5% signature requirement for non-statewide elections. It liberally construed his complaint as raising two arguments why the signature requirement was unconstitutional: (1) it "place[d] severe burdens on persons seeking to run as independent candidates," and (2) its "different treatment of statewide and non-statewide independent candidates violate[d] the Equal Protection Clause." *Id.* at 20. After considering this Court's recent decision in *Cowen v. Secretary of State*, 22 F.4th 1227 (11th Cir. 2022), the district court concluded that Bell failed to state a claim for relief.

The district court then turned to Bell's challenge to Georgia's statutory requirement that a candidate must seek review in superior court within five days of the Secretary of State denying his nomination petition. It concluded that Bell failed to state a claim because his allegations did not establish that the five-day window for judicial review imposed a severe burden on independent candidates' rights. The district court further concluded that the five-day window was reasonable given the State's interest in the prompt resolution of a candidate's challenge to the denial of his nomination petition in order to "(1) meet[] state and federal deadlines to finalize ballots for printing and sending to absentee voters, (2) conduct[] orderly elections, and (3) avoid[] voter confusion by not altering ballots after the election has begun." Doc. 33 at 33.

The district court also reviewed Bell's claim that he was denied due process because of the election officials' delay in reviewing his nomination petition, which deprived him of the opportunity to receive a hearing in superior court before the ballot printing deadline. It agreed with Bell that he "should have had a mandamus hearing before the ballot printing deadline." *Id.* at 35. But the court nevertheless concluded that his allegations did not "rise to the level of a constitutional violation." *Id.* at 36. Although the delay alleged by Bell "should be avoided in the future," the court concluded that this "episodic election irregularity . . . did not deprive [Bell] of his constitutional rights." *Id.* at 37 (internal quotation marks omitted).

In the same order, the district court also denied Bell's motion to amend his complaint to add a demand for compensatory and punitive damages. It concluded that the amendment was futile because "the complaint as amended would still be properly dismissed." *Id.* at 11.

This is Bell's appeal.

## II.

Several standards of review apply to this appeal.

We review *de novo* a district court's determination that it lacked subject matter jurisdiction to review a claim under the *Rooker-Feldman* doctrine. *Behr v. Campbell*, 8 F.4th 1206, 1209 (11th Cir. 2021). We also review *de novo* a district court's determination regarding mootness. *Hall v. Sec'y, Ala.*, 902 F.3d 1294, 1297 (11th Cir. 2018).

We review *de novo* a district court's ruling on a motion to dismiss for failure to state a claim. *Chua v. Ekonomou*, 1 F.4th 948, 952 (11th Cir. 2021). "We accept the allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Id.* But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Turner v. Williams*, 65 F.4th 564, 577 (11th Cir. 2023) (internal quotation marks omitted). To state a claim for relief, "[t]he alleged facts, having been stripped of all legal conclusions, must make a claim for relief not merely *possible*, but *plausible*." *Id.* (emphasis in original).

We "review the denial of a motion to amend for an abuse of discretion, but whether the motion is futile is a question of law that we review *de novo*." *Brooks v. Warden*, 800 F.3d 1295, 1300 (11th Cir. 2015).

We liberally construe a *pro se* litigant's pleadings, holding them "to less stringent standards than formal pleadings drafted by lawyers." *Campbell v. Air Jam. Ltd.*, 760 F.3d 1165, 1168 (11th Cir. 2014).

### III.

Bell raises several issues on appeal. First, he argues that the district court erred in concluding that it lacked jurisdiction to set aside the decisions of the superior court denying his application for a writ of mandamus and of the Georgia Supreme Court dismissing his appeal as moot. Second, he attacks the district court's determination that his request for injunctive relief directing the election

officials to put his name on the ballot was moot. Third, he argues that the district court erred in dismissing his constitutional claims for failure to state a claim for relief. Fourth, he says that the district court erred when it denied him leave to amend his complaint. We address each issue in turn.[7]

## A.

We begin by considering whether the district court erred when it concluded that it lacked jurisdiction to consider Bell's request to set aside the superior court order and the Georgia Supreme Court decision.

Under the *Rooker-Feldman* doctrine, "federal district courts cannot review or reject state court judgments rendered before the district court litigation began." *Behr*, 8 F.4th at 1212. The doctrine requires dismissal of a claim "when a losing state court litigant calls on a district court to modify or overturn an injurious state-court judgment." *Id.* at 1210 (internal quotation marks omitted).

Here, the district court did not err in concluding that it lacked jurisdiction to review a portion of Bell's complaint based on

---

[7] Bell also argues on appeal that the district court should have addressed whether he properly served Harvey. Although the election officials argued that Harvey had not been properly served, the district court declined to address the issue, saying that it "need not address the sufficiency of service on Harvey" because, regardless of whether Harvey had been served, Bell had failed to state a claim for relief. Doc. 33 at 8 n.8. Similarly, we need not address the service issue because even assuming that Bell properly served Harvey, his complaint was properly dismissed for the reasons that follow.

*Rooker-Feldman*. After the superior court denied Bell the relief he requested and the Georgia Supreme Court dismissed his appeal, he asked the district court to conclude that he submitted sufficient signatures to appear on the ballot and to "set aside" the state courts' decisions. Doc. 3 at 3. Because the *Rooker-Feldman* doctrine bars judicial review of a claim that calls on a district court to set aside a state court judgment, the district court properly concluded that it lacked jurisdiction.

Bell nevertheless argues that the *Rooker-Feldman* doctrine should not apply because we should recognize a fraud-on-the-court exception. As evidence of fraud, he points to irregularities in the letter from Harvey notifying him that he would not appear on the ballot: the letter incorrectly stated that it was sent in 2018 and its letterhead identified Kemp as the Secretary of State. Even assuming a fraud-on-the-court exception exists, we agree with the district court that Bell's allegations were insufficient to permit an inference that there was fraud, as opposed to a clerical oversight. *See Turner*, 65 F.4th at 577 (explaining that allegations must make a claim plausible). It's true that Bell alleged in his complaint that Harvey's document was "fraudulent." Doc. 3 at 10. But without more, this allegation is conclusory and therefore insufficient. *See Einhorn v. Axogen, Inc.*, 42 F.4th 1218, 1222 (11th Cir. 2022) ("[C]onclusory allegations . . . will not prevent dismissal." (internal quotation marks omitted)). Accordingly, we affirm as to this issue.

### B.

We now consider whether the district court erred when it concluded that Bell's request for injunctive relief was moot. "An issue is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Wood v. Raffensperger*, 981 F.3d 1307, 1316 (11th Cir. 2020) (internal quotation marks omitted). "[A]n issue can become moot at any stage of litigation, even if there was a live case or controversy when the lawsuit began." *Id*. We thus have recognized that certain types of relief in election-related cases may become moot after an election is complete and results are certified. *See id*. at 1316–17 (holding that voter's request that court enjoin Georgia's certification of election results and order a new recount for 2020 presidential election became moot after Georgia certified its election results).

Here, the district court did not err in dismissing as moot Bell's request for an injunction requiring the election officials to put his name on the ballot for the District 85 general election.[8] Because

---

[8] In addition to concluding that the request for injunctive relief was moot, the district court concluded that the capable-of-repetition-yet-evading-review exception to the mootness doctrine did not apply. Bell did not argue in his initial appellate brief that the district court erred in concluding that exception did not apply. He does suggest in his reply brief that the exception should apply because he plans to run as an independent candidate in the future. But an issue raised for the first time in a reply brief comes too late. *See Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008).

Even assuming Bell had adequately raised this issue on appeal, we agree with the district court that the exception does not apply here. Although Bell intends

the 2020 general election had already occurred, the district court could not give Bell injunctive relief in the form of an order requiring the election officials to add him to the ballot for that election. *See id*. Accordingly, we also affirm as to this issue.[9]

## C.

We next review whether the district court erred when it concluded that Bell failed to state a claim that the election officials committed a constitutional violation. Bell argues that he adequately alleged three distinct constitutional violations: (1) Georgia's signature requirement for independent candidates running for non-statewide office is unconstitutional; (2) Georgia's requirement that candidates seek review within five days of a Secretary of State decision denying a nomination petition is unconstitutional; and

---

to run again, his allegations do not show that there is a reasonable expectation that he would be subject to the same unique circumstances that occurred in 2020. The unique circumstances that Bell faced in 2020 included that the Secretary of State extended the deadline for independent candidates to submit their nomination petitions due to the COVID-19 pandemic, which shortened the period between the petition deadline and the ballot-printing deadline, and the Secretary of State's office delayed reviewing Bell's petition due to an attorney's vacation. *See Wood*, 981 F.3d at 1317–18.

[9] Our conclusion that Bell's request for this injunctive relief is moot does not mean that we do not reach the merits of his constitutional claims. We liberally construe Bell's complaint as requesting other forms of relief that are not moot. As we explain in the next section, the district court properly dismissed those claims because Bell failed to state a claim for relief.

(3) the election officials denied him due process given the delay in the review of his nomination petition.

As to the signature requirement, Georgia law requires that an independent candidate seeking to appear on the ballot for a non-statewide office submit a nomination petition signed by "a number of voters equal to 5 percent of the total number of registered voters eligible to vote in the last election for the filling of the office the candidate is seeking." O.C.G.A. § 21-2-170(b). But for the 2020 election, because of the COVID-19 pandemic, a court ordered the Secretary to use a lower threshold. *See Cooper*, 472 F. Supp. 3d at 1296. As a result, Bell needed to submit signatures from a number of voters equal to 3.5% of the total number of voters eligible to vote in the last election for District 85. *Id.*

Bell claimed that the signature requirement imposed a "severe burden" on independent candidates running for non-statewide office. Doc. 3 at 14. He also pointed out that Georgia imposed a different signature requirement on independent candidates running for statewide offices. To appear on the ballot, an independent candidate for statewide office needed to submit a nomination petition with signatures from "a number of voters equal to 1 percent of the total number of registered voters eligible to vote in the last election" for the relevant office. O.C.G.A. § 21-2-170(b). But for the 2020 election, an independent candidate for a statewide office had to submit signatures from a number of voters equal to 0.7% of the total number of registered voters eligible to vote in the last election for that office. Bell claimed that the use of "two different

standards for statewide candidates versus non-statewide candidates violate[d] the Equal Protection Clause." Doc. 3 at 14.

To evaluate the constitutionality of the signature requirement, we apply what is known as the *Anderson-Burdick* test. *See Curling v. Raffensperger*, 50 F.4th 1114, 1121 (11th Cir. 2022); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). We begin by "consider[ing] the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). We then "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* We then "weigh[] all these factors" to "decide whether the challenged provision is unconstitutional." *Id.* If the State's restriction "imposes a severe burden on the right to vote," then we apply "strict scrutiny," meaning the restriction "survives only if it is narrowly tailored to serve a compelling state interest." *Curling*, 50 F.4th at 1122. But if the challenged restriction does not impose a severe burden on First and Fourteenth Amendment rights, it need only be a "rational way" to meet the State's "important regulatory interests." *Cowen*, 22 F.4th at 1233–34 (internal quotation marks omitted).

We recently considered similar challenges to Georgia's signature requirement in *Cowen*. In *Cowen*, the Libertarian Party challenged Georgia's signature requirement for third-party and independent candidates running for non-statewide office, alleging that it imposed an unconstitutional burden under the First and

Fourteenth Amendments and also drew "an unjustified classification between prospective Libertarian candidates for statewide office and those for non-statewide office." *Id.* at 1230–31. We concluded that there was no constitutional violation. *Id.* at 1229.

Using the *Anderson-Burdick* test, we first considered whether the signature requirement "unconstitutionally burden[ed] . . . the right of individuals to associate for the advancement of political beliefs and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Id.* at 1231 (internal quotation marks omitted). In considering the scope of the burden, we observed at least one local candidate for a district attorney race had recently gathered enough signatures to exceed the 5% threshold and appear on the ballot as an independent candidate. *Id.* at 1232. We concluded that this candidate's success "show[ed] that the 5% requirement . . . does not bar candidates from the ballot." *Id.* We acknowledged that the signature requirement imposed some burden because collecting signatures could be "costly and difficult" and that Georgia's 5% requirement was "somewhat higher than that in other states." *Id.* at 1232–33. But there were several ways in which Georgia reduced the burden associated with collecting signatures: voters could sign petitions for multiple candidates, voters could sign a petition even if they voted in a party primary, voters did not have to state that they intended to vote for the candidate in order to sign a petition, the pool of voters eligible to sign included those not registered in the preceding election, and signatures did not need to be notarized. *Id.* We ultimately concluded that the

signature requirement did not severely burden First and Fourteenth Amendment rights. *Id.* at 1233.

We then considered the State's interest as justification for the signature requirement. *See id.* at 1233–34. We explained that the State's interests included "requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot, in maintaining the orderly administration of elections, and in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Id.* at 1234 (internal quotation marks omitted). We concluded that these interests were compelling. *Id.* Because Georgia's signature requirement was a "rational way to meet" these important regulatory interests, we held that it "survive[d] challenge under the First and Fourteenth Amendments. *Id.* (internal quotation marks omitted).

The Libertarian Party also claimed that Georgia's use of different qualification requirements for candidates seeking statewide offices and non-statewide offices violated the Equal Protection Clause.[10] *Id.* To evaluate this claim, we again applied the *Anderson-*

---

[10] Under Georgia law, Libertarian Party candidates for statewide office were automatically entitled to ballot access because in the preceding general election a Libertarian Party candidate for statewide office received a number of votes equal to or greater than 1% of the total number of registered and eligible voters. *See Cowen*, 22 F.4th at 1234 (citing O.C.G.A. §§ 21-2-170(b); 21-2-180). Although the party's candidates for statewide office were automatically included on the ballot, its candidates for non-statewide office still had to satisfy the 5% signature requirement. *Id.*

*Burdick* test. *Id*. at 1235. We determined that the "magnitude of th[e] inequality" between the treatment of non-statewide and statewide candidates was "(at most) only as substantial as the severity of the burden of meeting the 5% signature requirement— the hurdle non-statewide candidates must overcome," which we had already concluded was not severe. *Id*.

We explained that the disparity in treatment of candidates for statewide and non-statewide offices could "be justified if the State put[] forward an important regulatory interest." *Id*. We concluded that the State had a compelling interest in "ensuring that candidates have a significant modicum of support among the electorate before placing them on the ballot." *Id*. (internal quotation marks omitted). The application of a 5% signature requirement for non-statewide candidates served this interest because it required that prospective Libertarian candidates for non-statewide office had to have "a significant modicum of support within the [] district they seek to represent." *Id*. Although we could "imagine more narrowly tailored alternatives" to address the differences between Libertarian candidates for statewide and non-statewide offices, "perfect tailoring" was "not require[d] . . . when the disparity [was] not severe." *Id*. at 1235–36. We thus concluded that there was no equal protection violation. *Id*.

Consistent with *Cowen*, we conclude that Bell failed to state a claim for relief. *Cowen* tells us that Georgia's signature requirement for independent candidates for non-statewide office, either on its own or as compared to the different signature requirement

23-10059            Opinion of the Court            23

for independent candidates for statewide office, did not impose a severe burden. *Id.* at 1232–33. In addition, based on *Cowen*, we conclude that the signature requirement was a rational way to meet the State's regulatory interests. *Id.* at 1233–34.

Bell nevertheless urges us to reject *Cowen*, arguing that its reasoning is flawed. He criticizes the opinion's analysis of severe burden, saying that we failed to "take into account" the difficulties that independent candidates for non-statewide office face when collecting signatures.[11] Appellant's Br. 39. But under the prior-panel-precedent rule, we are bound by *Cowen* unless and until that holding is overruled by this Court sitting en banc or by the Supreme Court. *Smith v. GTE Corp.*, 236 F.3d 1292, 1300 n.8 (11th Cir. 2001). There is no "exception" to this rule "based upon a perceived defect in the prior panel's reasoning or analysis." *Id.* at 1303.[12]

---

[11] Although Bell criticizes the severe-burden analysis in *Cowen*, he does not dispute that if the burden were not severe, then the signature requirement would survive the constitutional challenges.

[12] In arguing that the signature requirement imposed a severe burden, Bell points to the difficulties that he faced in collecting signatures in the summer of 2020 due to the COVID pandemic. It is true that there was no claim in *Cowen* that the signature requirement was unconstitutional because of the unique difficulties involved in collecting signatures in 2020, during the height of the COVID-pandemic when there was no vaccine yet available. But after considering Bell's argument, we are not convinced that the signature requirement imposed a severe burden, particularly given that a court had reduced the signature requirement for non-statewide candidates from 5% to 3.5% because of the pandemic. *See Cooper*, 472 F. Supp. 3d at 1296.

We next consider whether Bell stated a claim that Georgia's requirement that a person whose nomination petition has been denied must seek review in state court within five days is unconstitutional. *See* O.C.G.A. § 21-2-171(c). To evaluate his challenge to the five-day requirement, we again look to the *Anderson-Burdick* test. We agree with the district court that "[a]lthough the five-day window to seek mandamus relief may pose difficulty and/or inconvenience," the allegations in Bell's complaint did not establish that it imposed a severe burden. Doc. 33 at 31. Instead, it is apparent from the face of Bell's complaint that candidates whose nomination petitions were denied, in fact, have been able to seek judicial review during this short window because, as the district court explained, Bell "himself was able to timely file his application for mandamus relief within the five-day window, and he has not alleged that the five-day mandamus deadline has prevented other candidates from appearing on the ballot." *Id.* at 32.

The election defendants have put forth a sufficient justification for the five-day requirement. The State has a compelling regulatory interest in quickly resolving challenges regarding independent candidates' appearances on the ballot so that the State can (1) meet state and federal deadlines to finalize ballots for printing and sending to absentee voters, (2) conduct orderly elections, and (3) avoid voter confusion by not altering ballots once the election has begun. Like the district court, we conclude that the five-day window is a reasonable way to meet these interests. *See Cowen*, 22 F.4th at 1234.

23-10059                Opinion of the Court                    25

Bell also claimed that he was denied due process because the election officials' delay in reviewing his nomination petition meant that he was unable to obtain review of the decision denying his nomination petition before the ballots had to be finalized. We again agree with the district court that Bell failed to state a claim for relief. Certainly, the allegations in his complaint reflect that election officials failed to review his nomination petition as quickly as Georgia law contemplates. *See* O.C.G.A. § 21-2-171(b) (directing Secretary of State to "expeditiously examine" a nomination petition). Although the delay was "unfortunate" and should not have happened, we agree with the district court that Bell's allegations simply do not "rise to the level of a constitutional violation." Doc. 33 at 35–36; *see Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980) (explaining that "every state election irregularity" is not "considered a federal constitutional deprivation").[13] Because Bell failed to state a claim, we affirm the district court's dismissal of his constitutional claims.[14]

---

[13] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[14] Bell also complains about the Georgia Supreme Court's delay in dismissing his appeal as moot, saying it should have resolved his appeal before the general election instead of waiting until after the election and then dismissing it as moot. *See* O.C.G.A. § 21-2-171(c) (directing an appellate court to announce its decision in an appeal related to the denial of a nomination petition "within such period of time as will permit the name of the candidate affected by the court's decision to be printed on the ballot if the court should so determine").

**D.**

Bell also argues that the district court erred when it refused to allow him to amend his complaint to add a request for compensatory and punitive damages. But a district court "may properly deny leave to amend [a] complaint . . . when such amendment would be futile." *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004). "[D]enial of leave to amend is justified by futility when the complaint as amended is still subject to dismissal." *Id.* (internal quotation marks omitted). Here, the district court did not err in denying Bell's motion to amend his complaint to add a request for damages. The amendment was futile because even with the amendment the complaint failed to state a claim for relief.

**IV.**

For the reasons set forth above, we affirm the district court.

**AFFIRMED.**

---

In its opinion, the Georgia Supreme Court acknowledged § 21-2-171(c)'s timing requirement but explained that Bell failed to file a motion seeking expedited review, and by the time Bell's appeal was docketed and he submitted a brief enumerating as error a superior court's decision on a nomination petition, "his appeal was already moot." *Bell*, 858 S.E.2d at 50 n.3. That Bell failed to avail himself of the expedited review available under § 21-2-171(c) does not mean that he was denied due process. *See Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259, 1267 (11th Cir. 2023) (explaining that plaintiffs' failure to "take advantage of [available] state procedures does not mean that the state deprived them of . . . due process").